UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Presby Environmental, Inc.           )
                                     )
           Plaintiff        )
                                     )
           v.          )        Case No. 1:13-CV-00355
                                     )
Advanced Drainage Systems, Inc.   )
                                     )
          Defendant     )

**EXPERT WITNESS REPORT**

**OF**

**MAUREEN S. LOFTUS**

**July 18, 2014**

## I.      <u>Introduction and Qualifications</u>

I have been asked by counsel to defendant, Advanced Drainage Systems, Inc. ("ADS"), to prepare this expert report on behalf of ADS.  This report contains my opinions and observations with respect to the expert report submitted on behalf of plaintiff, Presby Environmental, Inc. ("PEI"), entitled "Loss Analysis Due to Misperception and/or Confusion" written by Mr. Keith Dolan dated April 4, 2014.  This report also contains other opinions to which I may testify at the trial of this matter relating to plaintiff's claims and alleged damages.

I am a Principal with StoneTurn Group, a consulting firm that provides forensic accounting, forensic technology, intellectual property, complex business litigation, and remediation and monitoring services to attorneys, corporations, governmental entities and individuals across a wide range of matters and industries.  I have a Bachelor of Science degree in Economics from the Wharton School of the University of Pennsylvania.  While at the Wharton School, I concentrated my studies in the area of Business Analytics (formerly known as Decision Sciences).  Business Analytics is the careful application of analytical techniques to solve business problems. These analytical techniques have emerged from a variety of disciplines such as operations research, statistics, data mining, information science, computer science, marketing, and game theory.   I also studied accounting and first became licensed as a Certified Public Accountant in Pennsylvania in 1992; I am currently licensed in Pennsylvania, New York, Ohio, and Montana.

Since 1988, I have provided economic and financial consulting assistance, including investigative accounting services as well as expert testimony, to clients in a variety of industries. I have analyzed loss causation and performed damages quantification using generally accepted damages methodologies in cases involving allegations of breach of contract, business

interruption, patent and trademark infringement, trade secret theft, and unfair advertising and unfair competition.  As part of my work over the past 26 years, I have performed market and competitive analyses, including defining relevant product markets and relevant geographic markets, as well as market share analyses.

My curriculum vitae, along with a list of cases in which I have testified as an expert witness in deposition or trial in the last four years, are attached to this report as Exhibit A.  I have not authored any publications within the past ten years.  StoneTurn Group is being compensated for this engagement at hourly rates for the time I, and others working at my direction, spend to study the facts of this case, perform analyses, prepare this report and, if required, testify about my work.  StoneTurn's fees are computed at hourly rates ranging from $125 to $550. StoneTurn's fees are not contingent upon the outcome of this litigation.

My opinions are based upon my review and analysis of pleadings, discovery responses, documents produced by the parties, interviews with ADS personnel, publicly available information, and my background and experience.  I have attached as Exhibit B a list of the documents and other information I have considered in performing my analyses and forming my opinions.  I reserve the right to supplement my opinions based upon information that may become available subsequent to the date of this report.  When I testify, I may illustrate my testimony with demonstrative aids, such as graphs, charts and/or slides.

II.    **Background**

PEI and ADS are among several competitors in the marketplace in the United States and Canada for on-site septic systems.  PEI markets and sells an in-ground wastewater treatment product known as Enviro-Septic, and ADS markets and sells an in-ground wastewater treatment

product known as Geo-Flow.[1]  On May 20, 2009, PEI and ADS entered into a Settlement

Agreement that concluded prior litigation between the two parties then pending in federal court

in New Hampshire[2] regarding their competing septic products.  In August 2013, PEI alleged in a

new Complaint against ADS that ADS breached the Settlement Agreement by (i) representing

"in the marketplace" that Geo-Flow is the "functional equivalent" of Enviro-Septic, and (ii)

using test data for Enviro-Septic, as though such data were applicable to Geo-Flow, as part of a

regulatory or approval process in certain states, specifically Vermont and Indiana and possibly

New York or other states.[3]  The Complaint also alleges violations of the Lanham Act.  ADS

denies PEI's claims that it breached the Settlement Agreement and violated the Lanham Act.

ADS has also set forth other defenses.[4]

　　　　Plaintiff's Expert Disclosure dated April 4, 2014, states that PEI's retained expert, Mr.

Dolan, "will use his expertise in marketing to assign a monetary damages figure to the lost

revenue associated with ADS' breaches of the settlement agreement in the form of

representations made to regulatory authorities and stakeholders in the septic industry."[5]  The

disclosure further states that Mr. Dolan's figures "are currently limited to the states of which

Presby is aware," reserving the right to amend Mr. Dolan's report if further discovery reveals

additional violations of the Settlement Agreement.[6]

---

[1] Settlement Agreement and Mutual Release dated May 20, 2009, PEI 116-118.
[2] Id.
[3] In a proposed First Amended Complaint attached as Exhibit 1 to PEI's Motion for Leave to Amend Complaint dated May 23, 2014, PEI makes additional allegations. As of the date of this report, PEI's proposed First Amended Complaint has not been filed; therefore, ADS has not responded to PEI's new allegations contained therein.  I reserve the right to supplement my opinions if the proposed First Amended Complaint is filed.
[4] Defendant Advanced Drainage Systems, Inc.'s Answer and Affirmative Defenses dated October 8, 2013.
[5] Plaintiff's Expert Disclosure dated April 4, 2014, p. 1.
[6] Id. at pp. 1-2.

As a result of the alleged breaches by ADS, Mr. Dolan estimates that PEI has incurred damages in the form of past lost revenues and future lost revenues as follows:[7]

| Time Period | Dolan Amount | Totals |
|---|---|---|
| 2009-2013 | $2,066,250 | $2,066,250 - Past |
| 2014-2018 | $3,454,800 | |
| 2019-2022[8] | $4,750,350 | |
| 2023-2026 | $6,477,750 | $14,682,900 - Future |

Mr. Dolan also provides a cost estimate of $626,900 for "communication tools" that he recommends that PEI "consider" beginning in 2014 and continuously for each year from 2014 until 2026.

## III.    Summary of Opinions

I will testify as to the following opinions at the trial of this matter:

A.  The Dolan report is not reliable, and the damages quantification is purely speculative, because it fails to link the alleged wrongful acts of ADS to the economic harm that PEI allegedly incurred since 2009 through today and allegedly will suffer until the end of 2026, a total of eighteen years.  Even if liability and causation were established, Mr. Dolan's calculations do not rely on any generally accepted damages methodology, are unsupported, contain arbitrary and speculative assumptions, and are illogical.

B.  Mr. Dolan fails to deduct incremental costs from his lost revenues calculation, resulting in gross revenue values for his damages calculation.  To the extent PEI can show it lost any sales as a result of ADS's alleged wrongful acts, only incremental ***profits*** on any lost revenues are allowable as damages, not gross revenues.

---

[7] Dolan report, paragraph Nos. 8, 10, 11, 12.
[8] There appear to be numerous typographical errors in the year ranges set forth in the chart and table headings in the Dolan report.  I have adjusted this time period as it originally appeared in Mr. Dolan's report because of an overlapping year.

C.  Mr. Dolan's "Communications Expense" estimate for the years 2014 through 2026 is not adequately explained and makes no sense on its face.

IV.    **Explanation of Opinions**

In this section, I will explain my understanding of Mr. Dolan's loss analysis and will, in the absence of any explanation from Mr. Dolan, evaluate the assumptions upon which it appears to be based.   I will explain why I believe his loss analysis results in a damages calculation that is speculative and unreliable.

A.  The Dolan report is not reliable, and the damages quantification is purely speculative, because it fails to link the alleged wrongful acts of ADS to the economic harm that PEI allegedly incurred since 2009 through today and allegedly will suffer until the end of 2026, a total of eighteen years.  Even if liability and causation were established, Mr. Dolan's calculations do not rely on any generally accepted damages methodology, are unsupported, contain arbitrary and speculative assumptions, and are illogical.

The first step a damages expert must take in order to calculate lost profits is an economic causation analysis.  Only a proper study of economic causation allows one to trace and quantify the effects of an alleged wrongful act by a defendant and translate it to losses suffered by the harmed party.  To that end, the damages expert must separate the effects of the alleged wrongful acts from other factors that may have affected a firm's ability to earn profits but are unrelated to the alleged wrongful acts.  The economic impact of those other factors must be excluded from the damages calculation.  Lost profits are established by estimating the difference between (i) a plaintiff's cash flow or other measure of economic income in the "but for" world, that is, the world as it would have existed "but for" the harm caused by a defendant, and (ii) the plaintiff's cash flow or economic income in the "actual" world.  Absent a proper economic causation analysis, the damages quantification is unreliable and meaningless.

Mr. Dolan states that the objective of his work is to describe the results when a company claims that "[o]ur product works as well as our competitors' established product," and "[o]ur

product costs less than the established product."[9]  He employs what he refers to as the "customer behavior approach" to determine PEI's losses.  Based on his experience as a "Strategic Marketing Planner," he recites broad themes using marketing buzzwords and makes sweeping statements about customer behavior in the "modern marketplace."  He attempts to draw comparisons between this dispute involving septic systems and the actions of mass retailers (Walmart) and global brands (Apple, Samsung, Coca-Cola, Pepsi) selling mass consumer goods (iPhone and Galaxy smartphones and soft drinks) and spending billions of dollars in annual advertising.  He cites research from generalized surveys and blogger articles found on the internet having to do with subject matter that, in my view, is irrelevant in this case.

Implicit in Mr. Dolan's calculations are the following assumptions:  (a) the only way ADS has obtained or will obtain regulatory approval for Geo-Flow is by misrepresenting its performance to government officials; (b) if ADS makes a representation to a customer that Geo-Flow "works the same and costs loss,"[10] PEI loses that customer to ADS; and (c) Geo-Flow is priced lower than Enviro-Septic, and the Settlement Agreement somehow forbids ADS from competing on price.  As to the damages period, Mr. Dolan assumes it begins on an unspecified date in 2009 (though it appears to be January 1) and continues to the date of the trial of this matter and beyond until the end of 2026.

Mr. Dolan provides no basis for any of these assumptions.  He fails to mention that Geo-Flow has been subjected to two independent, third party tests since May 2009,[11] tests that ADS provides to states when seeking regulatory approval.  He also fails to mention that ADS has obtained state regulatory approval for Geo-Flow without the claim of functional equivalency to Enviro-Septic.

---

[9] Dolan report at p. 1.
[10] Id. at p. 2.
[11] ADS's Responses to First Set of Interrogatories and Requests for Production of Documents, p. 6.

Mr. Dolan did not interview actual customers or perform a survey of actual or potential customers in the on-site septic industry in the relevant states to determine the extent to which PEI may have been damaged by actual customer reliance on alleged misleading statements by ADS or customer confusion caused by ADS or its dealers.  He has not identified one Geo-Flow customer who would have purchased Enviro-Septic but for the conduct complained of in the Complaint.

Mr. Dolan fails to mention the fact that, according to PEI, not only does PEI compete with ADS, it also has numerous other direct competitors in both the leach field market, which includes traditional pipe-and-stone and plastic chamber leach fields that are usually less expensive, as well as the "'treatment system market' which is generally occupied by mechanical treatment systems."[12]

Mr. Dolan cannot know whether Geo-Flow is actually less expensive than Enviro-Septic, and, if so, by how much, in what states, and under what circumstances, because he failed to perform any comparative pricing analysis.  Nor did he perform a comparison of Enviro-Septic's pricing with any other competitor's products.   Even assuming Geo-Flow is less expensive than Enviro-Septic, he concludes that it is somehow improper for ADS to compete on price.  He also arbitrarily assumes a Geo-Flow customer would pay more for Enviro-Septic in the absence of a representation by ADS or its dealer that Geo-Flow is the "functional equivalent" of Enviro-Septic.

In a nutshell, Mr. Dolan appears to have arbitrarily assumed that PEI's annual revenues from 2009 to today would have been higher than its actual revenues but for the actions of ADS, and that this condition will maintain, increasing in magnitude, in a step function, for twelve years after the trial of this matter.  He has ignored relevant information and data that is contrary to his

---

[12] PEI 371-372.

conclusions.  Therefore, in my opinion, Mr. Dolan's loss computations are unreliable because they represent an exercise in speculation and arithmetic without any economic analysis.

In the remainder of my report, I will discuss each category of Mr. Dolan's estimates of PEI's revenue losses.

1.  Past losses – 2009 to 2013

The predicate for Mr. Dolan's past lost revenue calculation appears to be contained in paragraph 7 in his report, in which he states that ADS has an "unrestrained competitive advantage of product *functional equivalency* [emphasis in original] and lower pricing."[13]  As a result, he claims that ADS's alleged wrongful acts have caused PEI to lose revenues in the amount of $2,066,250 for the period 2009 to 2013.

Mr. Dolan performs a so-called "Loss Analysis for 2009 to 2013 Dist./Dealers."[14]  He provides no narrative associated with his calculations or the bases for them; what language there is appears only in titles and column headings.  The mechanics of the calculation are as follows. PEI's 2009 dealers are arrayed into seven different revenue category levels, labeled A to G, apparently depending on their actual sales volume in 2009.  He multiplies the number of dealers that fall into each category by the revenue value at the bottom of each category.  He then applies an arbitrary "loss" rate of 15% to each category after which he multiplies the resultant value by five, an amount purportedly representing the "Current Average Lifetime of Dist/Dealer Relationship (Years)."  The total of these calculations across the seven categories is $2,066,250.

Again, Mr. Dolan provides no explanation for this approach and why he believes that, because of the alleged wrongful acts of ADS, PEI should have had 15% more dealers than it actually had in 2009 in the precise revenue-level categories in which its actual dealers fell in

---

[13] Dolan report, paragraph 7.
[14] Dolan report, paragraph 8.

8

2009.  The arbitrary loss percentage appears to be unanchored to any data.   It is not presented in relation to PEI's actual growth rates or any other objective measure.

Further, these figures are not presented in relation to the specific states where Mr. Dolan opines that PEI's growth was affected by the alleged wrongful actions by ADS after the parties entered into the Settlement Agreement in May 2009.  It does not appear that Mr. Dolan conducted a state-by-state analysis at all, or took into account the timing of any alleged misrepresentations or the regulatory approvals granted to ADS.  This contradicts a representation contained in Plaintiff's Expert Disclosure dated April 4, 2014, which states that Mr. Dolan's "figures are currently limited to the states of which Presby is aware."

In my opinion, a state-by-state analysis is the only appropriate approach that a damages expert should consider given the facts and circumstances in this case.  Both PEI and ADS must obtain state approvals before selling their septic systems in each state.  Therefore, a factual inquiry should have been conducted to determine in which states ADS is alleged to have breached the Settlement Agreement by wrongfully submitting PEI's test data or claiming that Geo-Flow is the "functional equivalent" of Enviro-Septic to state authorities.  Then, one must determine if and when an approval was ultimately granted to ADS in each such state.  Further, the damages expert should determine whether use of PEI's test data gave ADS a head start in obtaining regulatory approval and if ADS actually made sales in that state.  Finally, the damages expert should analyze the instances where ADS or its dealers represented in the marketplace that Geo-Flow is the "functional equivalent" of Enviro-Septic.  It is my understanding that the only allegation of this occurring relates to a trade show in New Hampshire in October 2013,[15] but that allegation has not been tied to Mr. Dolan's damages analysis.   Yet, Mr. Dolan assumes that

---

[15] Proposed First Amended Complaint attached as Exhibit 1 to PEI's Motion for Leave to Amend Complaint dated May 23, 2014, paragraphs 43-53.

ADS or its dealers made improper representations in every state where PEI does business leading to lost sales revenues by PEI to ADS.

Even a cursory review of each company's sales data by state demonstrates the flaws in Mr. Dolan's blanket loss approach. For example, PEI states in its Complaint that it has incurred losses resulting from ADS's alleged improper Vermont application for Geo-Flow submitted after the Settlement Agreement date. Yet the data show that PEI has not lost any sales to ADS in Vermont from 2009 to 2013 for two reasons: (i) ADS didn't get approval to sell Geo-Flow in Vermont until 2013; and (ii) to date, ADS has made **no** sales there.[16] Yet, according to PEI's sales records, PEI has made over $700,000 in sales in Vermont from 2009 to 2013;[17] Mr. Dolan reports PEI's sales in Vermont in 2013 alone were $155,643.[18] With respect to Indiana, authorities there did not approve Geo-Flow until 2012.[19] While ADS's sales to date in Indiana have been approximately $243,000, PEI's sales since 2009 have been more than ten times that amount.[20]

Examining both companies' sales figures in New Hampshire also shows that Mr. Dolan's blanket loss approach is faulty. First, Mr. Dolan states that he was informed by key managers at PEI that PEI has captured 90% of the New Hampshire market for septic system installations over the past 10 to 12 years owing to Mr. David Presby's "passion for the industry."[21] According to Mr. Dolan, PEI's sales in New Hampshire in 2013 alone were over $3 million, compared to

---

[16] ADS 000841 and ADS 001632.
[17] PEI 357-370; PEI spreadsheet entitled "2003-2013 Sales by State.xlsx."
[18] Dolan report, paragraph 2. Mr. Dolan shows that PEI had 6 distributors/dealers in Vermont in 2013 with the resulting average revenue per distributor/dealer of $22,234. His arithmetic is incorrect for Vermont, as well as Alabama, Indiana, Massachusetts, Maine, Montana, New Hampshire, Ohio and Wyoming. There is also a discrepancy between Mr. Dolan's report and PEI's sales records. According to PEI 357-370 and PEI spreadsheet entitled "2003-2013 Sales by State.xlsx," PEI's sales in Vermont in 2013 were $119,558, not $155,643.
[19] ADS 000684.
[20] ADS 1632; PEI 357-370; PEI spreadsheet entitled "2003-2013 Sales by State.xlsx." According to PEI's sales records, PEI's sales from 2009 to 2013 in Indiana were $2,882,877.
[21] Dolan report, pp. 1-2.

ADS's sales of approximately $30,000 in the year ending March 31, 2014.[22]  Second, ADS was already selling Geo-Flow in New Hampshire prior to entering into the Settlement Agreement, having been granted regulatory approval there in 1992.[23]  With these facts and figures, I believe it is speculative for Mr. Dolan to assert, by using his blanket approach, that PEI should have had 15% more dealers than its 2009 dealer level in New Hampshire, PEI's largest state by sales volume.

 Mr. Dolan seemingly ignores the possibility of acceptable competitive behavior by ADS and its distributors promoting Geo-Flow on its own merit and not as a "functional equivalent" of Enviro-Septic.  As to pricing, Mr. Dolan states that ADS has a competitive advantage because of lower pricing,[24] yet according to PEI's website, **"Enviro-Septic®** is smaller, less expensive, more adaptable and simpler to install/maintain than any comparable product on the market!"[25]  It is my understanding that the Settlement Agreement does not preclude ADS from competing on price or making any representations with respect to its pricing relative to PEI, and ADS "is not otherwise limited in advertising or marketing Geo-Flow or responding, consistent with applicable law, to competitive claims of PEI."[26]

 Mr. Dolan assumes that if PEI loses a customer, it is lost to ADS.  By doing so, he ignores the presence of other existing direct competitors to PEI in the marketplace.  Examples of some of the larger players include those selling leach field systems including Plastic Chambers (Infiltrator), EZ-Flow (Infiltrator); Multi-Pipe (manufactured by PTI) and Eljen GSF (Eljen Corp.); and treatment systems, including Ecopod (Delta Environmental); Jet Systems (Jet Inc.),

---

[22] Dolan report, paragraph 2 and ADS 001632
[23] ADS 000841.
[24] Dolan report, paragraph 7.
[25] http://presbyeco.com/products/enviro-septic/
[26] Settlement Agreement and Mutual Release dated May 20, 2009 (PEI 116-118).

AdvanTex (Orenco), Micro-Fast (Bio-Microbics), Singulair (Norweco), and Pura-Flow (Anua).[27]
As a result, he fails to consider material evidence and marketplace realities by improperly
attributing all of PEI's losses that he calculates to ADS's alleged wrongful acts.

There are numerous other flaws in Mr. Dolan's past loss analysis.  The reasoning behind
the static grouping of distributors/dealers by category A to G as of 2009 is faulty because it is
obvious that dealers will move from one category to another over time.  Yet this is the starting
point of his calculation.  PEI's Sales by Customer Summary[28] shows numerous examples of this
fact.  For example, over the eight-year period 2005 to 2012, PEI's New Hampshire Customer
No. 34 moves among three categories – B, C and D – staying in the same category for more than
one year only once.  Over the seven-year period 2005 to 2011, PEI's Vermont Customer No. 42
moves among four categories:  C, D, E and F; and, over the eleven-year period from 2003 to
2013, PEI's Indiana Customer No. 185 falls into every category from A to G except C and lands
in the highest category – category A (sales over $500,000) – in both 2012 and 2013.

In sum, Mr. Dolan's "customer behavior approach" to determine PEI losses is not an
appropriate way to estimate PEI's losses, if any, as a result of ADS's alleged wrongful acts.
He improperly attributed all the lost revenues he estimates to ADS's alleged wrongful conduct
without considering other causes as well as lawful competitive behavior.  A minimum
requirement of an acceptable damages computation methodology would have been for Mr. Dolan
to conduct a factual investigation to understand the alleged breaches by ADS and the timeline
thereof, while taking into account the competitive environment as well as any mitigating factors.
Without a proper economic analysis of loss causation, on a state-by-state basis, one cannot

---

[27] Letter from Mark S. Derby to Daniel J. Mullen dated May 27, 2014, p. 2, item 7; PEI 356; PEI 371-372.
[28] PEI 357-370.

determine what sales, if any, were lost by PEI to ADS as a result of ADS's alleged wrongful conduct.

2. <u>Future losses – 2014 to 2026</u>

As with his past lost revenue calculation, the predicate for Mr. Dolan's future lost revenue calculations appears to be contained in paragraph 7 in his report, wherein he states that ADS has an "unrestrained competitive advantage of product *functional equivalency* [emphasis in original] and lower pricing." He posits that ADS "…could be limiting [PEI's] future market and revenue growth up to 40% to 60% or possibly higher if PEI is unable to defend their competitive advantage of product differentiation and perceived value to current and future customers and prospects."[29] As a result, Mr. Dolan claims that ADS's alleged past wrongful acts will cause PEI to lose revenues for many years into the future, long after the trial in this matter at which a liability verdict in favor of PEI would stop the injury-causing behavior.

The time period associated with PEI's future lost revenue calculation is 2014 through 2026 "to cover length of product patent 2026."[30] Mr. Dolan gives no explanation as to why he computes PEI's future lost revenues for the entire remaining term of one of PEI's unidentified patents and why any damages to PEI resulting from any alleged wrongdoing by ADS should flow concomitantly with a patent term. There is no patent infringement claim in PEI's Complaint. In my opinion, Mr. Dolan's future loss time period makes no sense.

Mr. Dolan performs a so-called "Loss Analysis, for Non-Acquisition of Future Dist./Dealers" in a table in paragraph 9 of his report. Again, he provides no narrative explaining, much less justifying, his calculations or the bases for them. He incorporates a "Four Year

---

[29] Dolan report, paragraph 7.
[30] Dolan report, paragraphs 10, 11 and 12.

Average Lifetime Customer Relationship Revenue Values for Calculation"[31] by dealer size – the revenue-level categories are now small, medium and large instead of A through G – into his future lost revenue calculations which are split among three shorter time periods: 2014 to 2018, 2019 to 2022,[32] and 2023 to 2026. In each future loss time period, Mr. Dolan multiplies the customer lifetime revenue value by the "2012-13 Number of New Acquisition Dist./Dealers." In the last step of his calculation, he applies arbitrary loss rates of 20%, 27.5% and 37.5% to the resultant sums in the three time periods respectively – more than doubling the loss rate of 15% that he used in his 2009 to 2013 lost revenue calculation.

The mechanics of the calculation in each time period are identical in all respects except one: the loss rate which actually *grows* over time. It appears that the only reason for splitting the calculation among three future time periods is so that escalating loss rates may be applied. In other words, in Mr. Dolan's opinion, PEI's damages will <u>increase</u> over time, even though ADS's alleged wrongful conduct occurred as far back as 2009 and only as late as October 2013, and even though the trial of this matter is scheduled to take place in 2014 after which time a liability verdict in PEI's favor would stop ADS's alleged wrongful acts. The yearly increasing loss amounts by time period are as follows:[33]

| Time Period | Dolan's Lost Revenue Calculation |
|---|---|
| 2014-2018 | $863,700 per year |
| 2019-2022[34] | $1,187,588 per year |
| 2023-2026 | $1,619,438 per year |

---

[31] There appear to be one or more typographical errors in the titles and/or table headings in the Dolan report.

[32] There appear to be numerous typographical errors in the year ranges set forth in the chart and table headings in the Dolan report. I have adjusted this time period as it originally appeared in Mr. Dolan's report because of an overlapping year.

[33] Dolan report, paragraphs 10, 11 and 12.

[34] There appear to be numerous typographical errors in the year ranges set forth in the chart and table headings in the Dolan report. I have adjusted this time period as it originally appeared in Mr. Dolan's report because of an overlapping year.

The notion that the rate of economic harm could increase the further away in time from the alleged wrongful conduct and after it has ended, assuming liability is found at trial, is not only counterintuitive, but it is arbitrary.

From all appearances, the mention of "40% to 60%" as well as the selection of the escalating loss rates of 20%, 27.5% and 37.5%, come from thin air. These arbitrary percentages appear to be untethered to any economic analyses; they are not presented in relation to PEI's past growth rates and its future projected growth, to the extent PEI has any projections at all. These figures are not presented by Mr. Dolan in relation to specific states where he believes PEI's future growth will be affected by the past alleged wrongful actions by ADS occurring after the parties entered into the Settlement Agreement in May 2009. Mr. Dolan deems the escalating loss percentages as "conservative." Yet, an estimate is only conservative relative to some reasonable benchmark and a reasonable benchmark is nowhere to be found in Mr. Dolan's report.

These future loss percentages are not only speculative but the entire analysis ignores marketplace realities. Mr. Dolan ignores the possibility of acceptable competitive behavior by ADS whereby ADS and its distributors promote Geo-Flow on its own merit and not as a "functional equivalent" of Enviro-Septic. Mr. Dolan ignores the presence of existing direct competitors in the market as well as the possibility of new competitors entering the marketplace. He ignores the likely development of new technologies by existing or future competitors, or the possibility of changes in the regulatory environment in which PEI operates.

Mr. Dolan presents revenue categories ranging from A to G based on size for his past loss analysis, but they are grouped into small, medium and large categories for his future loss analysis. Mr. Dolan provides no reasoning or other explanation as to why they should differ, even assuming there was a reasonable basis to group them as he did in the first place. In any

event, as I described in the previous section with respect to Mr. Dolan's calculations for PEI's past losses, the reasoning behind the grouping of distributors/dealers by category A to G is faulty because dealers change categories over time.  I provided several examples of PEI customers moving from one category to another, sometimes several categories over the years.   Mr. Dolan's own table in paragraph 9 of his report also illustrates that very point:  a "small" dealer ranges from $5,000 to $37,000 over five years; a "medium" dealer ranges from $12,000 to $58,000 and a "large" dealer ranges from $25,000 to $90,000.  The fact that the categories overlap with each other means that a dealer with sales of $30,000 in a particular year simultaneously falls into **all** three categories.

In sum, as described previously, Mr. Dolan's "customer behavior approach" to determine PEI losses is not an appropriate way to estimate PEI's losses, if any, as a result of ADS's alleged wrongful actions, past or future.

Finally, even if there were a reasonable basis to project future lost profits, any future loss amounts must be discounted to present value at the expected time of the trial using an appropriate discount rate because the purpose of a damages award is to provide a sum that, with principal and interest, will yield a plaintiff an amount equivalent to its loss. The discount rate will have two components: (i) a component to recognize the time value of money, i.e., $1 to be received at some point in the future is not worth $1 today; and (ii) a component, referred to as the "risk premium" which recognizes the risk of achieving the profit expectation.  Failure to discount to present value any amounts that are projected to be earned in the future amounts to a windfall to a plaintiff.

**B.  Mr. Dolan fails to deduct incremental costs from his lost revenues calculation, resulting in gross revenue values for his damages calculation.  To the extent PEI can show it lost any sales as a result of ADS's alleged wrongful acts, only incremental *profits* on any lost revenues are allowable as damages, not gross revenues.**

As described above, Mr. Dolan's calculations of lost past and future gross revenues suffer from numerous deficiencies.  Compounding the unreliability of Mr. Dolan's analysis is the absence of a calculation or even a discussion that acknowledges that an acceptable damages methodology, and common sense, requires that the incremental costs of making any lost sales must be deducted from any estimation of lost gross revenues, so that the resulting amount is lost profits not lost revenues.  Failure to do so results in a windfall to a plaintiff and violates one of the most basic rules in computing lost profits.  To my knowledge there is no legal or economic theory under which a plaintiff may claim as damages lost revenues without deducting incremental costs.

Put simply, quantifying lost profits can be separated into two steps:  (i) estimating the revenues that a plaintiff lost resulting from a wrongful act; and (ii) deducting the incremental costs that would have been incurred to earn those revenues.

It appears that Mr. Dolan did no work to compute the incremental costs that PEI would incur to make any additional sales.  According to Mr. Dolan's report, he did not request or review relevant PEI financial records such as profit and loss statements, balance sheets, general ledgers, commission statements, budgets, projections, forecasts, and financing information which would have enabled him to do an appropriate calculation.   To my knowledge, PEI has not produced any such information, nor has any other potential witness performed such a calculation.  This is one more respect in which plaintiff's damages claim in the form of lost revenues is overstated and unreliable.

17

**C.  Mr. Dolan's "Communications Expense" estimate for the years 2014 through 2026 is not adequately explained and makes no sense on its face.**

Mr. Dolan's "Communications Expense" estimate for the years 2014 until 2026 is not based on a generally accepted method of estimating corrective advertising damages.  The estimate is not adequately explained, the amounts are hypothetical, and do not appear to represent actual or planned expenditures by PEI.  The notion that such expenditures would be required to continue annually for more than a dozen years after the trial in this matter to correct any alleged marketplace confusion due to the wrongful acts allegedly committed between 2009 and 2013 by ADS is unsound.

I understand that a plaintiff in an unfair advertising case may claim as a measure of damages what is referred to as "corrective advertising" costs.  These are expenditures that either have been incurred in the past or will be incurred by the plaintiff to correct any alleged confusion in the marketplace caused by the wrongful past acts of a defendant.  The generally accepted methodology to compute this damages amount requires a study of the plaintiff's books and records to determine what actual expenditures have been made in this regard or to determine what planned expenditures will be made that are specifically targeted to correct marketplace confusion or harm due to the alleged past wrongful acts of the defendant.

Here, Mr. Dolan appears to make generic suggestions rather than use a reliable methodology to determine this measure of potential damages.  There is nothing in Mr. Dolan's report or documents produced by PEI to date to show that PEI has incurred or will incur **any** incremental advertising costs, trade show expense, social media expense, website development costs, internal communications expense or public relations expenditures as a result of any alleged breaches of the May 2009 Settlement Agreement or other alleged wrongful acts by ADS.

18

Mr. Dolan's description of the "Communications Expense" tactics and tools is so overly broad and non-specific with respect to the allegations in this case that it makes no sense. The action items he lists and the "tactics and tools" for PEI "to consider" appear to be only suggestions. I believe they lack sufficient specificity for them to be understood, let alone for them to apply to the facts in this case.

For example, Mr. Dolan suggests that PEI spend approximately $70,000 in vague "public relations" expenses, such as a feature story somewhere about a "benevolent act" or "human interest."[35] He also suggests that PEI spend $4,000 annually beginning in 2014 until 2026, spanning twelve years after the trial in this matter, for a total of $52,000, on internal communications, which he defines as "ongoing education of staff and allied partners marketplace feedback, changes and opportunities."[36] This vague phrase does not make sense, and it is difficult to believe that such an expenditure, whatever it consists of, would be necessary or effective years after the alleged wrongful conduct by ADS.

Aside from the generic and vague nature of the "tactics and tools" Mr. Dolan lists, the amounts associated with the various categories of expenditures are unsupported.[37] He apparently performed no analysis that would begin to show that they would be incremental to PEI's business to the extent they are actually incurred in the future. For example, Mr. Dolan suggests that PEI spend $15,000 a year from 2014 to 2020 and then $18,000 a year from 2021 to 2026, a total of $213,000, attending or participating in trade events, meetings or seminars. Nowhere in Mr. Dolan's report does he acknowledge that, for the period 2008 to 2013, PEI attended

---

[35] Dolan report, pp. 10-11.
[36] Id.
[37] The individual yearly amounts by category appear in an erratic fashion over the thirteen-year period, again with no explanation as to why. Three categories have constant values; two categories have values that are constant from 2014 to 2020 and then rise and remain constant from 2021 to 2026; and two categories have values that jump back and forth throughout the thirteen-year period.

approximately 35 to 50 trade shows/industry events every year and provided 5 to 10 training seminars annually.[38]  It is reasonable to assume that PEI's normal business practice would be to continue to attend the trade shows/industry events that it feels are necessary and useful to maintain its presence in the marketplace and increase its sales generation opportunities for as long as it remains in business as a going concern.  Therefore, it is difficult to believe Mr. Dolan's recommended future expenditures would be an incremental cost to PEI at all.

PEI already has a sales and marketing department composed of internal staff as well as an outside sales network that promotes PEI's technology exclusively or as their primary business.[39]  Thus, it is incumbent upon Mr. Dolan to show that any corrective advertising damages amounts would be over and above the amounts PEI will expend but for any alleged breaches by ADS.  Without evidence or documentation showing that such expenditures would be incremental, this entire category of damages is unreliable.

Finally, the projected time period of Mr. Dolan's suggested communications expense matches that of his speculative future lost revenue calculations discussed earlier in my report.  It is not reasonable to believe that such expenditures, even if they were made, could be justified to occur for years after the alleged wrongful actions by ADS and continue for more than a decade after the trial of this matter in which a liability verdict would end the alleged wrongful conduct.  Further, matching the projected time period for such expenditures to a remaining patent term of one of PEI's patents is unjustified and unjustifiable.

While I have already discussed at length my opinion as to Mr. Dolan's speculative estimation of PEI's future lost revenues through 2026, I must add that there is clearly a logical problem with the inclusion of the recommended future expenditures as a measure of damages in

---

[38] PEI 371-372.
[39] Id.

the same report as he predicts future lost revenues.  Hypothetically speaking, if PEI were to

adopt Mr. Dolan's tactics and tools and incur the communications expense he suggests, why

would PEI continue to do so year after year if it has no effect on reducing future losses?  On the

other hand, if Mr. Dolan's tactics and tools were to be adopted and they work, why would PEI

incur future losses at all?


\* \* \*


*Maureen S. Loftus*

Maureen S. Loftus


Dated:  July 18, 2014

Presby Environmental, Inc. v. Advanced Drainage Systems, Inc. Exhibit A



# Maureen S. Loftus, CPA

*Complex Business Litigation*
*Intellectual Property*
*Forensic Accounting*

17 State Street, 26th Floor

New York, NY 10004

Tel: +1 212 430 3444

Fax: +1 212 430 3399

mloftus@stoneturn.com

**Education:**

B.S. Economics -

The Wharton School,
University of
Pennsylvania

Maureen Loftus has more than 25 years of expert witness and economic consulting experience in a variety of industries, including media and entertainment, consumer products, insurance, telecommunications, manufacturing and financial services. In the litigation consulting arena, Maureen specializes in developing damages models and valuing businesses in cases involving intellectual property, business interruption, product liability, lender liability, accountant malpractice, post-acquisition disputes and partnership dissolutions. She has provided expert testimony in federal and state courts, as well as international arbitrations, on matters involving breach of contract, breach of fiduciary duty, patent infringement and trademark damages, results of fraud investigations, trade secret misappropriation, and liquidated damages.

Maureen has provided investigative accounting services in matters involving mutual fund business practices, insurance broker business practices, embezzlement, fraudulent transactions, manipulation of accounting records, and theft of corporate assets.

Prior to joining StoneTurn, Maureen was a Vice President at Charles River Associates and a Managing Director with Huron Consulting Group. Before that, she was a partner at Deloitte & Touche and PricewaterhouseCoopers. Maureen is a certified public accountant in Pennsylvania, New York, Ohio and Montana.

## SELECT PROFESSIONAL EXPERIENCE

- Analyzed and prepared economic damages and lost profit calculations due to alleged breach of contract, fraud and other allegations. Provided expert testimony at deposition and trial to describe and support the analyses and opinions.

- Managed engagement involving alleged fraudulent misrepresentations in connecting with an acquisition of a consumer products company. Computed damages to buyer resulting from inflated valuation of the target company.

- Performed all aspects of damages analysis in intellectual property cases, such as identification of lost sales, estimation of lost profits, reasonable royalty, price erosion, market assessments, convoyed sales, unjust enrichment and prejudgment interest for both plaintiffs and defendants. Provided expert witness testimony at deposition and trial in patent infringement and trade secret misappropriation cases.

- Acted as expert for both claimants and respondents in numerous international arbitration proceedings in matters involving alleged breach of contract of long-term supply agreements of manufactured goods and commodities, termination of a bottling agreement for soft drinks, and termination of a license agreement to manufacture and sell equipment and consumer products.





# Maureen S. Loftus, CPA

*Complex Business Litigation*
*Intellectual Property*
*Forensic Accounting*

**SELECT PROFESSIONAL EXPERIENCE (continued)**

- Implemented the use of data mining and forensic data analysis technology tools and techniques to identify and evaluate anomalies in financial and transactional data; identify and quantify patterns of possible fraud; and assess fraud risk factors due to deficient or weak control environments.

- Managed engagement and performed analyses to calculate property damage, business interruption, extra expense claims and other economic losses for a large company's insurance claim arising from the events of September 11.

- Conducted analysis of agent commission and supplier agreements to recompute appropriate amount of payments due under those agreements.

- Managed internal investigations involving allegations by NY Attorney General and SEC of mutual fund market timing and late trading. Analysis involved extensive data mining of shareholder transaction activity and quantification of economic impact of dilution.

- Managed internal investigation of insurance broker practices involving contingent commissions and other business practices in light of NY Attorney General and state insurance commissioner investigations into such practices.

**PREVIOUS EXPERIENCE**

- 2009 – 2013
  - *Vice President*, Charles River Associates, New York, NY
- 2005 – 2009
  - *Managing Director,* Financial & Economic Consulting, Huron Consulting Group, New York, NY
- 2001 – 2005
  - *Partner*, Financial Advisory Services, Deloitte & Touche LLP, New York, NY
- 1999 – 2001
  - *Partner*, Financial Advisory Services, PricewaterhouseCoopers, New York, NY
- 1988 – 1999
  - *Staff through Senior Manager,* PricewaterhouseCoopers, Management Consulting Services and Financial Advisory Services Group, Philadelphia, PA and New York, NY



AUSTIN · BOSTON · CHICAGO · HOUSTON · LONDON · NEW YORK · SAN FRANCISCO · WASHINGTON, DC



# Maureen S. Loftus, CPA

*Complex Business Litigation*
*Intellectual Property*
*Forensic Accounting*

**PROFESSIONAL AFFILIATIONS / OTHER**

- American Institute of Certified Public Accountants (AICPA)
- Licensing Executives Society



Presby Environmental, Inc. v. Advanced Drainage Systems, Inc.                    Exhibit A

## MAUREEN S. LOFTUS
Testimony in the Last Four Years

*Meadwestvaco Corporation, et al. v. Rexam PLC, Rexam Beauty and Closures, Inc., Valois S.A.S.\* and Valois of America, Inc.\**
U.S. District Court, Eastern District of Virginia
July 2011 (deposition)

*Kyiv-Based Law Firm v. Large International Law Firm\**
International Centre for Dispute Resolution
September 2011 (arbitration)

(\*Denotes client)

Presby Environmental, Inc. v. Advanced Drainage Systems, Inc.                    Exhibit B

## Documents and Information Considered

### I. Pleadings and Discovery Responses

Complaint and Demand for Jury Trial dated August 7, 2013.

Disclosure Statement Pursuant to Local Rule 7.5 dated August 7, 2013.

Corporate Disclosure Statement of Advanced Drainage Systems, Inc. dated October 18, 2013.

Defendant Advanced Drainage Systems, Inc.'s Answer and Affirmative Defenses dated October 8, 2013.

Defendant Advanced Drainage Systems, Inc.'s First Set of Interrogatories and Requests for Production of Documents dated November 8, 2013.

Defendant Advanced Drainage Systems, Inc.'s Initial Disclosures dated December 13, 2013.

Plaintiff's Rule 26(a) Initial Disclosures dated December 16, 2013.

Plaintiff's Answers to Defendant's Interrogatories and Responses to Requests for Production of Documents dated January 8, 2014.

First Set of Interrogatories and Requests for Production of Documents to be Answered Under Oath by the Defendant, Advanced Drainage Systems, Inc. dated February 3, 2014.

Plaintiff's Expert Disclosure dated April 4, 2014.

Defendant Advanced Drainage Systems, Inc.'s Responses to First Set of Interrogatories and Requests for Production of Documents dated April 18, 2014.

Joint Motion for Order Approving and Entering Proposed Stipulated Protective Order dated May 9, 2014.

Plaintiff's Motion for Leave to Amend Complaint dated May 23, 2014

Defendant Advanced Drainage Systems, Inc.'s Supplemental Responses to First Set of Interrogatories dated June 6, 2014.

### II. Documents Produced by Parties

#### A.  Documents Produced by Plaintiff

**Starting Bates No.     Ending Bates No.**

PEI 1                              PEI 370

**Additional Files**

Presby Docs1-372 5-27-2014.pdf

2003-2013 Sales by State.xlsx

Presby Environmental, Inc. v. Advanced Drainage Systems, Inc.                              Exhibit B

**B.  Documents Produced by Defendant**

| <u>**Starting Bates No.**</u> | <u>**Ending Bates No.**</u> |
|---|---|
| ADS000001 | ADS001632 |
| DB-ADS000001 | DB-ADS002865 |

## III. Expert Report

Loss Analysis Due to Misperception and/or Confusion of Keith Dolan dated April 4, 2014, and documents and articles referenced therein.

## IV. Other

Interviews with ADS personnel:  Mike Huebert, Bob Klein and Chris Stewart

http://presbyeco.com

http://www.ads-pipe.com/en/product.asp?page=GEO-Flow_Pipe_Systems